1

2

3

4

5

6

7

8

9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10

11

| | | |
|---|---|---|
| PATRICIA MENDEZ, | ) | 1:09-cv-1968 LJO GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | FINDINGS   AND   RECOMMENDATIONS |
| | ) | REGARDING  PLAINTIFF'S |
| v. | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

12

13

14

15

16

17

18

19

## **BACKGROUND**

20

Plaintiff Patricia Mendez ("Plaintiff") seeks judicial review of a final decision of the

21    Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

22    supplemental security income pursuant to Title II of the Social Security Act.  The matter is

23    currently before the Court on the parties' briefs, which were submitted, without oral argument, to

24    the Honorable Gary S. Austin, United States Magistrate Judge.[1]

25    ///

26    ///

27

28    [1] Plaintiff has not consented to the jurisdiction of the Magistrate Judge.  Therefore, the Court has issued
Findings and Recommendations.  *See* (Doc. 4).

**FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed an application for supplemental Disability Insurance Benefits alleging disability beginning October 4, 2006.  AR 114; 129.  The application was denied initially and on reconsideration. (76-80; 84-89).  Subsequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 7.  ALJ Michael Haubner held a hearing on March 19, 2009, and issued an order denying benefits on August 12, 2009.  AR 12-65.  On February 27, 2009, the Appeals Council denied review.  AR 2-4.

**Hearing Testimony**

The hearing before ALJ Haubner on March 19, 2009 was held in Fresno, California.  AR 27-65.  Plaintiff was represented by attorney Robert Ishikawa.  Vocational Expert ("VE") Thomas C. Dachelet also testified.  AR 49-66.

Plaintiff testified she has a General Education Diploma ("GED") and completed truck driving school.  She obtained a class A commercial driving license in 2000, and previously worked as a truck driver.  Plaintiff still drives an automatic shift van approximately one to two times per month.  AR 33-35.  She has also worked as a vinter (a wine sampler) and a clerk.  AR 50.

Plaintiff lives in a house with her twenty-nine year old daughter who works part-time.  AR 34.  Plaintiff does some household chores including making her bed two times per week and changing the sheets on her bed twice a month.  AR 36.  While Plaintiff is not able to take out the trash or clean the house, she is able to do her own laundry once every two weeks, and water flowers in her yard once every three months.  AR 37; 43.  Plaintiff does not dust, wash the windows, mop the floors, or iron.  AR 41-42.

For the most part, Plaintiff is able to take care of her daily needs.  She prepares three simple meals a per day, feeds herself, and goes grocery shopping one time per month.  AR 38-40.  She washes dishes one time per day and goes out to eat approximately one time per month.  AR

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

40.  She is able to take a shower and dress herself, but she needs assistance putting on her shoes approximately two to four times per month.[3]  AR 38; 60-61.

For enjoyment, Plaintiff paints watercolors and listens to music approximately one time per week.  AR 42.  For the remaining time, Plaintiff watches television one hour two times per week and reads for one and a half hours, three times per week.  AR 43-44.  Plaintiff does not leave the house to visit friends, however, family comes over to her house approximately three times per week.  AR 40.  She does not attend church regularly because she does not have a ride. AR 39, 47.  When Plaintiff does go out of the house, she keeps to herself.  AR 47.  However, she generally gets along with others and does not get into fights.  AR 46-47.

Plaintiff slipped and fell in July 2006 and suffers from a neck and back sprain/strain, degenerative joint disease, cervical, thoracic, and lumbar discectomies, as well as neuropathy of the upper and lower extremities.  She also has a history of depression, diabetes, and obesity. Plaintiff is five feet six inches tall and weighs 210 pounds.  AR 44.  She has been trying to lose weight by dieting and exercising.  AR 48.  She performs exercises her doctor recommended about five times per day for fifteen minutes.  AR 48.  To date, Plaintiff has lost approximately 42 pounds.  AR 49.

After her fall, Plaintiff had surgery in December 2008 which helped control the pain in her wrists and neck, however, she continues to have numbness in her left index finger and the thumb which extends all the way up to her elbow.  AR 57.  As a result, she is unable to grasp items with her left hand.  AR 61.  She also still suffers from constant pain in the lower portions of her back and hips that extends down her left leg resulting in her left foot getting hot and swollen.  AR 57-58.  She takes showers and lays with a pillow between her legs to help her feel better.  AR 58.  Prior to the surgery, Plaintiff participated in physical therapy and had trigger point injections which helped to relieve the pain.  AR 58.  She has also participated in acupuncture about once every two months, and had treatments using an electrical stimulus

[3]  The ALJ notes that Plaintiff gave inconsistent testimony regarding the number of times she needs help with her shoes. AR 24.  In the beginning of the testimony Plaintiff indicates she needs assistance once per week, however, later, she indicated it was two to three times per month.  Although the ALJ indicates this inconsistency was significant, the Court disagrees.  AR 38; 60-61.

3

1 ("TENS") unit.  The electrical stimulus treatments however were not effective over time.  AR 58-
2 59.

3      Plaintiff is able to lift and carry five pounds, can stand for twenty minutes, and can walk
4 for thirty feet.  Plaintiff has difficulty paying attention and can only stay focused for one hour at a
5 time.  She spends approximately five hours a day laying down and can only sleep for four to six
6 hours a night.  The four to six hours she spends sleeping are interrupted sleep as she is unable to
7 sleep for long periods at a time.  AR 45-48.

8      VE Dachelet testified at the hearing.  The VE indicated that Plaintiff's past job as a truck
9 driver is classified as medium work as defined by the Dictionary of Occupational Titles, but was
10 heavy as performed.  Plaintiff's work as a clerk was categorized as light and unskilled; her work
11 as a delivery driver was classified as medium physical semiskilled; and her work as a wine
12 sampler was classified as light unskilled. AR 49-50.

13      ALJ Haubner asked the VE to consider a hypothetical worker of Plaintiff's age,
14 education, and past relevant work who is able to relate and interact with co-workers, supervisors
15 and the general public.  This worker is also able to maintain attention, concentration, and carry
16 out simple and complex and/or technical job instructions. VE Dachelet opined that this worker
17 could perform her past relevant work as a wine sampler and as a clerk.  VE Dachelet also opined
18 that this worker could perform other sedentary to very heavy unskilled work as defined under the
19 Medical-Vocational Rules ("the Grids").  AR 53-54.

20      In a second hypothetical, the VE was asked to assume a worker who could lift and carry
21 twenty pounds occasionally and ten pounds frequently, who could stand and walk about six out
22 of eight hours, who could sit for six out of eight hours, and who could occasionally climb,
23 balance, stoop, kneel, crouch, and crawl, without any reaching limitations.  When asked whether
24 this worker could perform the Plaintiff's past relevant work, VE Dachelet stated that this worker
25 could perform all sedentary and light unskilled work as defined by the Grids.

26      In a third hypothetical, the VE was asked to consider a worker who could carry less than
27 10 pounds "occasionally and frequently," who could stand and walk for two to four hours out of
28 an eight hour day, who can sit for six hours in an eight hour day, and had exertional limitations

including kneeling, balancing, crouching, and crawling.  The VE testified that this person could not perform Plaintiff's past relevant work but could perform sedentary work.[4]  AR 55-56.

In the fourth hypothetical, the VE was asked to consider a worker who could lift and carry five pounds, who could stand for twenty minutes at a time, who could sit for fifteen to twenty minutes, who could walk about thirty feet, and who needs to lie down five out of eight hours a day.  This worker also tries to isolate themselves from the general public.  The VE opined that this worker could not perform the Plaintiff's past relevant work nor any other work.  AR 56.

**Medical Record**

On July 21, 2006, Plaintiff slipped and fell in a convenience store.  As a result, she experienced pain in her lower and mid-back, hip, as well as numbness in her left leg, foot, and toes.  Plaintiff was referred to Dr. Thomas Dosumu-Johnson, M.D., after receiving chiropractic/physical therapy.  AR 190-191.  On December 4, 2006, Dr. Dosumu-Johnson saw Plaintiff for a consultation and diagnosed her with lumbar spine strain/sprain with radiation to the lower extremities, status post slip and fall.  AR 192-194; 289- 297.

Dr. Todd Spencer, M.D., a radiologist at the MRI Imaging Center in Fresno, performed a magnetic resonance imaging (MRI) on January 12, 2007.  This test revealed mild central spinal stenosis at L3-L4 and L4-L5 and small disc protrusions at T11-T12,  L1- L2, with the most significant appearing at L5-S1.  Dr. Spencer also noted there was an 8 mm left foraminal disc protrusion which is narrowing the left neural foramen and encroaching upon the left L5 nerve root.  AR 200-201; 286-287.

On March 5, 2007, Plaintiff was evaluated by John C. Chiu, M.D., a neurologist at the California Back Specialist Medical Group in Newbury Park, California, for a neurospinal evaluation.  AR 355-360.  Dr. Chiu diagnosed Plaintiff with post-traumatic lumbar disc herniation with stenosis and lumbar radiculopathy; post-traumatic cervical disc herniation with cervical radiculopathy; post-traumatic thoracic strain/disc disease; post-traumatic left shoulder

---

[4]  This hypothetical appears to be based on an evaluation completed by Dr. Mehdi, M.D. The Court notes that it is unclear whether Plaintiff could perform sedentary work based on this evaluation  as the dialogue between the ALJ and the VE is not clear in this regard.  AR 55-56.   Furthermore, the ALJ's decision is inconsistent : on page 22 of the decision the ALJ notes Dr. Mehdi opined that Plaintiff could perform sedentary work, however, on page 23 of the decision, the ALJ notes that Dr. Mehdi's opinion limits Plaintiff to sedentary or less than sedentary work.

1    strain and left hip sprain/strain.  AR 254.  Dr. Chiu recommended x-rays, an MRI scan of the

2    thoracolumbar spine with and without weight bearing, and an EMG of bilateral upper and lower

3    extremities.  He also prescribed Celebrex and Darvocet for pain, and recommended trial bilateral

4    trapezius trigger point injections, bilateral paralumbar vertebral nerve blocks, and a physical

5    therapy program including flexion exercises.  AR 255.

6        In March 2007, an MRI scan of the lumbar spine with weight bearing performed by the

7    Medical Imaging Group at the California Spine Institute[5] revealed 5-6 mm disc protrusions at L5-

8    S1 and L2-3; a 4 mm disc protrusion at T12-L1; and a 2 mm broad-based disc protrusion which

9    increased to 3 mm with weight bearing images.  The disc protrusions along with thickening of

10   ligamentum flava resulted in mild-to-moderate central canal stenosis at L4-5, and a 2 mm disc

11   bulge at T11-12. AR 366; 514-515

12       In March 2007, x-rays of the cervical spine showed osteophyte formation with disc space

13   narrowing at C5-6.  X-rays of the thoracic spine revealed anterior wedging, loss of vertical

14   height, and degenerative changes.  AR 368-369.   March 2007 x-rays of the sacrum and coccyx

15   showed acute angulation of the coccyx without definite fracture or subluxation.  The angulation

16   at the disc might be due to injury and was associated with soft tissue swelling. AR 367.  March

17   2007 x-rays of the left shoulder showed calcific tendinitis and osteoarthritic changes of the

18   acromioclavicular joint. AR 370.

19       Similarly, a March 2007 nerve conduction study/electromyography study revealed right

20   and left median motor neuropathy, right ulnar neuropathy, right peroneal motor neuropathy, left

21   posterior tibial motor neuropathy, prolonged right and left H-reflexes, and chronic denervation of

22   all muscles tested in both the uppers and lower extremities.  AR 372; 518.   It was noted that

23   these abnormalities are seen in patients with C5 and C6 radiculopathy and L5 and S1

24   radiculopathy on both sides.  AR 371-372; 518.

25       After these tests, Plaintiff was assessed by Dr. Mehdi, M.D., a consultative examiner, at

26   the request of the Social Security Administration on June 9, 2007.  AR 310- 313.  Dr. Mehdi

27   noted that Plaintiff was not on any medication, walked with a slightly wide-based "antalgic gait"

28

_____

[5]  The majority of Plaintiff's MRIs and x-rays occurred at this facility.

that was stable, and had a weakly positive Romberg.[6]  AR 310-312.  He assessed a normal

cervical spine range of motion with normal curvature, alignment with no spasms, and a reduced

lumbar spine range of motion with diffuse spasms.  AR 312.  Dr. Mehdi diagnosed Plaintiff with

lumbar spine disc disease and lumbar spine radiculopathy.  AR 313.   Dr. Mehdi opined that

Plaintiff could lift and carry less than ten pounds occasionally and frequently, could stand and

walk two to four hours out of an eight hour day, and could sit for six hours out of an eight hour

day.  He imposed exertional limitations on climbing, stooping, kneeling, pushing, balancing,

crouching, crawling, and pulling. AR 313.

On June 9, 2007, Plaintiff was evaluated by Dr. Ekram Michiel, M.D., a psychiatric

consultive examiner at the request of the Social Security Administration.  Dr. Michiel noted no

past psychiatric hospitalizations and no mental health follow-up.  AR 315.  He also noted that

Plaintiff was not taking medications and that Plaintiff's gait and posture were normal with no

involuntary movements.  AR 316.  Dr. Michiel found Plaintiff's attitude during the interview was

angry and frustrated but she was oriented to person, place, and date.  AR 316.

Dr. Michiel diagnosed Plaintiff with depressive disorder, not otherwise specified with a

Global Assessment of Functioning ("GAF") of 60.[7]  AR 317.  He opined that Plaintiff could

maintain attention and concentration, carry out simple job instructions (but not an extensive

variety of technical or complex instructions), handle her own funds, and relate and interact with

coworkers, supervisors, and the general public.  AR 317.

On July 27, 2007, x-rays of Plaintiff's lumbar spine revealed a wedging fracture with 27

percent loss of height anteriorly of the T12 vertebral body.  Osteophyte formation with disc space

narrowing at L5-S1, L2-3 and to a lesser degree at L3-4 levels was noted.  There was also soft

---

[6] In a Romberg test, the patient is asked to stand up with feet together and eyes closed.  If the patient loses balance, this is a sign of a loss of the sense of position and a positive Romberg test.  Medline Plus, A service of the U.S. National Library of Medicine, National Institutes of Health, http://nlm.nih.gov/medlineplus/ency/article/003198.htm (Last visited December 9, 2010).

[7] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").  A GAF between 51 and 60 indicates "[moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  DSM- IV at 34.

tissue swelling in both wrists with no fractures or dislocation.  AR 347-48; 506-07.  A CT scan of the cervical spine performed on that same date revealed a 3-mm broad-based disc osteophyte complex asymmetric to the left with left-sided foraminal narrowing and possible impingement on the exiting nerve root on the left at C5-6. AR 508.

In a September 25, 2007 letter to Dr. Rao, Dr. Chiu recounted his recommendations to Plaintiff after three different appointments.  AR 494-98. After her May 2007 appointment, Dr. Chiu recommended a moist heat and exercise program, a preoperative MRI of the lumbar spine, an MRI of the cervical spine, and he discussed surgery with her.  AR 494.  Dr. Chiu also ordered that Plaintiff remain on temporary total disability and advised that she return in two weeks for re-evaluation and recommendation. AR 495.  After Plaintiff's July 2007 appointment, Dr. Chiu again recommended a moist heat and exercise program, x-ray of the wrists, a CT scan of the cervical spine, physical therapy, trigger point injections and vertebral nerve blocks.  AR 495. After Plaintiff's August 2007 appointment, Dr. Chiu further recommended Plaintiff continue her moist heat and exercise program, trigger point injections, vertebral nerve blocks, and he discussed surgery with her again.  AR 495-96.  Dr. Chiu ordered that Plaintiff remain on temporary total disability and advised that she return in a month for re-evaluation. AR 496.

On November 21, 2007, a nerve conduction study and electromyography study report revealed right and left median motor neuropathy, right and left ulnar motor neuropathy, prolonged F-wave latency of the right median nerve, and chronic denervation of all tested muscles in both upper extremities.  AR 488-489.

After Dr. Michiel's psychiatric assessment, on July 26, 2007, Stephen Baily, M.D.,  a non-examining medical consultant, completed a Psychiatric Review Technique form.  Dr. Baily opined that Plaintiff's affective disorder was non-severe.  AR 328.  He diagnosed Plaintiff with depressive disorder not otherwise specified and noted Plaintiff was intact mentally with mild impairments in maintaining concentration, persistence, or pace.  She also had mild impairments when performing technical or complex instructions and mental operations.  AR 331; 338.

On July 11, 2007, Dr. I. Ocrant, M.D., completed a physical residual functional capacity (RFC) form. AR 320-324.  Dr. Ocrant opined that Plaintiff could lift/carry twenty pounds

occasionally and ten pounds frequently, she could stand, walk, and sit for six hours in an eight

hour day, and she could occasionally climb, balance, stoop, kneel, crouch, and crawl.  AR 320-

324.  Dr. Ocrant reviewed Plaintiff's medical record including the consultative orthopedic exam

by Dr. Mehdi.  Dr. Ocrant reported some inconsistencies bearing on Plaintiff's credibility.  AR

327.  Specifically, Dr. Ocrant found the reasons Plaintiff gave for not taking medications were

not credible because she was using non-steroidal anti-inflammatory drugs. AR 327. Dr. Ocrant

also noted Plaintiff possessed a wide range of functionality and that physical observations

appeared to be situationally dependent, based on the type of exam Plaintiff was having.  AR 327.

For example, Plaintiff's gait was normal at her psychological consultive exam but antalgic at her

physical consultive exam that was performed that same day.  AR 327.  Based on the above, Dr.

Ocrant found Plaintiff could perform light work with some postural limitations.  AR 327.

On October 18, 2007, Dr. Sadda Reddy, M.D., a non-examining Department of Social

Security physician completed a case analysis and noted Plaintiff had received seven nerve blocks

yet reported no change in her activities of daily living.  Dr. Reddy noted that Plaintiff's treating

physician opined that the Plaintiff could return to work in October 2007.  Dr. Reddy affirmed the

prior light RFC with postural limitations. Similarly, at that same time, Dr. Garcia, also a non-

examining Department of Social Security physician,  noted no change in Plaintiff's mental

condition and affirmed the prior classification of a non-severe affective disorder.  AR 378-379.

No further testing was done until April 2008 when Plaintiff's cervical spine MRI again

revealed an osteophyte complex with narrowing, central canal stenosis; impingement on the

exiting nerve roots; cord compression at C5-6; as well as a disc bulge.  AR 484.

On June 20, 2008, a CT scan of the cervical spine showed a 5-mm broad-based disc

osteophyte complex asymmetric to the left with the left-sided foraminal narrowing and possible

impingement on the exiting nerve root on the left at C5-6.  The CT scan also revealed a 2-3 mm

broad-based disc osteophyte complex asymmetric to the left with the left-sided foraminal

narrowing and possible impingement on the exiting nerve root on the left at C6-7. AR 467.

On June 20, 2008, a CT of the lumbar spine showed a "6 mm broad-based disc

osteophyte complex extending into the left neural foraminal narrowing impingement on the

1   exiting nerve roots bilaterally more on the left side at L2-3 and L5-S1." This test also revealed

2   "3 mm broad-based disc protrusions compromising the left-sided foramina and impingement on

3   the exiting nerve root on the left at L3-4 and L4-5." AR 468.

4        A June 2008 nerve conduction study and electromyography study report showed right and

5   left median motor neuropathy, left ulnar motor neuropathy, right peroneal motor neuropathy,

6   right and left posterior tibial neuropathy, prolonged right and left H-reflexes, chronic deviation of

7   all tested muscles in both upper extremities, and chronic denervation of all tested muscles in both

8   lower extremities. AR 469-471.

9        On July 23, 2008, an MRI scan of the lumbar spine showed a 6mm broad-based disc

10  protrusion/posterior osteophytes with foraminal narrowing; central canal stenosis; impingement

11  on the exiting nerve roots at L5-S1 and L2-3; a 3-4 mm broad-based disc protrusion/posterior

12  osteophytes with foraminal narrowing and impingement on the exiting nerve root at T12-L1 and

13  L3-4; and a 3 mm broad-based disc protrusion/posterior osteophytes at L4-5. AR 447-448.

14  Additional x-rays of the lumbar spine disc space revealed narrowing at L5-S1, L3-4, and L2-3

15  and anterior wedging of T11, T12, and L1 vertebral bodies. AR 448. An x-ray of the thoracic

16  spine revealed anterior wedging of T8 through T12. AR 449.

17       On July 23, 2008, a nerve conduction study and electromyography study report showed

18  right and left posterior tibial motor neuropathy, prolonged right and left H-reflexes, and chronic

19  denervation of all tested muscles in both lower extremities. AR 459-460.

20       A history and physical report form from Dr. Chiu dated December 8, 2008 further

21  diagnosed Plaintiff with post-traumatic thoracic disc herniation with radiculopathy and post-

22  traumatic T12 vertebral compression fracture. Dr. Chiu recommended surgery. AR 415-418.

23       December 8, 2008 x-rays of Plaintiff's cervical spine showed osteophyte formation with

24  disc space narrowing at C5-6 with reversal of normal cervical lordosis. AR 429. X-rays of the

25  thoracic spine showed osteophyte formation with angular wedging at T11 and T12 with disc

26  space narrowing at multiple levels of the thoracic spine. AR 431. X-rays of the lumbar spine

27  revealed osteophyte formation with disc space narrowing at L5-S1, and to a lesser degree at L2-3,

28  and anterior wedging of T12 and L1. AR 430.

1    A December 8, 2008 MRI scan of the thoracic spine showed 5-mm broad-based disc

2  protrusions and impingement on the exiting nerve roots at L5-S1 and L2-3; a 3 mm disc

3  protrusion at L4-5; and a 3-4 mm broad-based disc protrusion with foraminal narrowing and

4  impingement on the exiting nerve roots.  AR 432.

5    A December 8, 2008 MRI scan of the cervical spine showed a 5-6 mm broad-based

6  osteophyte complex with bilateral formaminal narrowing; central canal stenosis; impingement on

7  the exiting nerve roots and cord compression at C5-6; a 3mm broad-based disc

8  protrusion/osteophyte complex with bilateral foraminal narrowing and possible impingement on

9  the exiting nerve roots.  AR 433.

10    On December 9, 2008, Plaintiff had back surgery which included three procedures: 1) a

11  cervical discogram of C5 and C6 and microdecompressive cervical discectomy of C5-6 and C6-7

12  under magnification (AR 401-03); 2) a provacative thoracic discography of T12 and

13  microdecompressive thoracic discectomy of T12 (AR 406-08); and 3) a provacative lumbar

14  discogram and microdecompressive lumbar discectomy of L2, L4 and L5 under magnification.

15  AR 411-413.  This surgery was recommended based on the failure of other conservative

16  treatments including physiotherapy, medication, acupuncture, electromuscular treatment, and

17  exercise programs.  AR 417.

18    On December 10, 2008, post-surgical x-rays of the thoracic and cervical spine revealed

19  intact endplates without prevertebral or paraspinous soft tissue mass.  Osteophyte formation was

20  noted in the mid-to-lower thoracic spine with anterior wedging of T11 and possibly T10 vertebral

21  bodies.  AR 398-399.

22    On December 15, 2008, a CT scan of the lumbar spine showed a 3mm disc osteophyte

23  complex into the left neural foramina superimposed on the exiting nerve roots bilaterally at L5-

24  S1; a 2mm broad-based disc protrusion with foraminal narrowing and impingement on the

25  exiting nerve roots; and anterior wedging of T12 and L1.  AR 386-387.

26    A December 8 and 15, 2008, nerve conduction study and electromyography study

27  revealed right and left peroneal motor neuropathy; right and left posterior tibial motor

28

1   neuropathy; prolonged right and left H-reflexes; and chronic denervation of all tested muscles in

2   both lower extremities.  AR 388-389; 419-428.

3          In December 2008, Plaintiff underwent an epidural blood patch and bilateral cervical

4   facet injections. AR 395; 435.

5          A January 2009 nerve conduction study and electromyography study report showed "left

6   posterior tibial neuropathy versus technical difficulties to obtain study from left posterior tibial

7   nerve, prolonged right and left H-reflexes, and chronic denervation of all tested muscles in both

8   lower extremities, borderline in degree."  AR 381-385.

9          In a February 25, 2009 letter, Dr. Chiu stated Plaintiff had post-traumatic lumbar disc

10  herniations with spinal stenosis and lumbar radiculopathy as well as post-traumatic cervical disc

11  herniation with cervical radiculopathy.  AR534.  He also noted Plaintiff's December 2008

12  surgery.  Dr. Chiu opined that because of the severe nature of Plaintiff's spinal condition which

13  includes herniated discs, evidence of spinal stenosis and osteoarthritis, facet arthritis, and spinal

14  nerve compression, Plaintiff would not be able to return to her work as a truck driver

15  permanently.  AR 534-535.

16         In addition to the above evaluations and surgery, Plaintiff underwent fourteen para

17  lumbar ventral nerve block procedures beginning March  2007 through December 2008 (AR 344;

18  349; 353; 364; 394; 434; 436; 454; 458; 478; 501; 505; 513; 527); eight bilateral trapezius trigger

19  point injections beginning March 2007 through July 23, 2007 (AR 345; 350; 352; 365; 455; 479;

20  512; 526);  and six sacroiliac joint trigger point injections beginning March 2007 through July

21  2008 respectively.  AR 346; 486; 487; 499; 500; 504.

22         She also applied for a disabled placard from the California Department of Motor Vehicles

23  on February 22, 2007, April 11, 2008, and October 7, 2008.  AR 301-302; 440-442; 482-483.

24  Furthermore, on different occasions after her fall, she was assessed as unable to perform her

25  regular job duties or as temporarily or totally disabled. AR 249; 270-271; 273-274; 275-281;

26  303-304; 342-343; 354; 396; 439; 443; 480; 485; 502-503; and 509-510.

27  ///

28  ///

**ALJ's Findings**

After considering the record, the ALJ determined that Plaintiff had not engaged in a substantial gainful activity since October 4, 2006, and had severe impairments including a status post slip and fall with cervical/lumber sprain/strain; degenerative disc disease; status post cervical, thoracic, and lumbar discectomies; neuropathy of the upper and lower extremities; and a history of diabetes mellitus, obesity and depressive disorder. AR 17. However, the impairments did not meet the listed impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. AR 17.

With respect to Plaintiff's RFC, the ALJ determined that Plaintiff could perform sedentary and light unskilled work. AR 18. Accordingly, the ALJ found Plaintiff could perform her past relevant work as a clerk and vinter sampler. AR 24. Alternatively, he found that Plaintiff was a younger individual, with a high school education who could communicate in English, and that jobs existed in significant numbers in the national economy which she could perform according to the Grids. AR 24. Thus, Plaintiff was not disabled as defined in the Social Security Act. AR 25.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

1  substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th
2  Cir. 1987).

3  ## REVIEW

4      In order to qualify for benefits, a claimant must establish that he is unable to engage in
5  substantial gainful activity due to a medically determinable physical or mental impairment which
6  has lasted or can be expected to last for a continuous period of not less than twelve months. 42
7  U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of
8  such severity that he is not only unable to do his previous work, but cannot, considering his age,
9  education, and work experience, engage in any other kind of substantial gainful work which
10 exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).
11 The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th
12 Cir. 1990).

13     In an effort to achieve uniformity of decisions, the Commissioner has promulgated
14 regulations which contain, inter alia, a five-step sequential disability evaluation process. 20
15 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f). Applying this process in this case, the ALJ found
16 that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his
17 disability; (2) has an impairment or a combination of impairments that is considered "severe"
18 based on the requirements in the Regulations (20 CFR § 416.920(c)); (3) does not have an
19 impairment or combination of impairments which meets or equals ones of the impairments set
20 forth in Appendix 1, Subpart P (20 CFR Part 404); (4) cannot perform his past relevant work as a
21 as groundskeeper or yard worker; yet (5) retained the RFC to perform a full range of light work.
22 AR 14-18.

23 ## DISCUSSION

24     Plaintiff argues that the ALJ: 1) improperly evaluated the physician opinion evidence, 2)
25 failed to evaluated Plaintiff's GAF score, 3) failed to consider all of Plaintiff's impairments
26 including her diabetes, and 4) incorrectly discredited Plaintiff's pain testimony. Plaintiff also
27 argues that she should be evaluated for a closed period of disability. (Doc. 3-16). The Court
28 addresses each of these arguments below.

### A.       The Physician Opinion Evidence

Plaintiff argues that the ALJ improperly dismissed Dr. Chiu's opinion and instead relied on Dr. Ocrant's opinion who found Plaintiff could perform light work with some postural limitations.  Specifically, Plaintiff argues that the ALJ cites no reason for rejecting Dr. Chiu's opinion other than stating that Dr. Chiu's opinion is not controlling.  Plaintiff also argues the ALJ improperly rejected Dr. Mehdi's opinion.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007).

On the other hand, an ALJ may reject a contradicted treating physician's opinion on the basis of clear findings that set out specific, legitimate, reasons for the rejection.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  A statement by a physician indicating a claimant is "disabled" does not mean that the Secretary will concur, absent review of medical findings and other evidence. 20 C.F.R. 416.927(e).  "Conclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ."  *Nyman v. Heckler*, 779 F.2d 528 (9th Cir. 1985).

1    In *Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007)*, the Ninth Circuit reiterated and

2    expounded upon its position regarding the ALJ's acceptance of the opinion an examining

3    physician over that of a treating physician. "When an examining physician relies on the same

4    clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions

5    of the examining physician are not '"substantial evidence."' *Orn, 495 F.3d at 632*; *Murray, 722*

6    *F.2d at 501-502*. "By contrast, when an examining physician provides 'independent clinical

7    findings that differ from the findings of the treating physician' such findings are 'substantial

8    evidence.'" *Orn, 496 F.3d at 632*; *Miller v. Heckler, 770 F.2d 845, 849 (9th Cir.1985)*.

9    Independent clinical findings can be either (1) diagnoses that differ from those offered by another

10   physician and that are supported by substantial evidence, *see Allen v. Heckler, 749 F.2d 577, 579*

11   *(9th Cir.1985)*, or (2) findings based on objective medical tests that the treating physician has not

12   herself considered, *see Andrews, 53 F.3d at 1041*.

13   As a preliminary matter, Plaintiff has argued that the ALJ must give clear and convincing

14   reasons to reject Plaintiff's treating physician's opinion. In this case, Dr. Chiu, Plaintiff's

15   treating physician, opined that Plaintiff suffers from a spinal condition which includes herniated

16   discs, evidence of spinal stenosis and osteoarthritis, facet arthritis, and spinal nerve compression.

17   AR 534-535. As a result, Dr. Chiu concluded Plaintiff would not be able to return to her work as

18   a truck driver permanently.[8] *Id.* The ALJ rejected this opinion and adopted the opinions of Dr.

19   Ocrant and Dr. Reddy, who are non-examining physicians. Both of these physicians concluded

20   that Plaintiff was able to perform light work. AR 324-327; 378-379. Since Plaintiff's treating

21   physician's opinion was contradicted by other doctors, the ALJ must only provide specific,

22   legitimate reasons based on substantial evidence in the record to reject it. Nevertheless, a review

23   of the record reveals that the ALJ has failed to do so.

24   When evaluating the physicians' opinions, the ALJ stated the following :

25

26   ————————————

27   [8] The Court notes that the VE classified Plaintiff's work as a truck driver as medium work. AR 49-50.
     Since Dr. Ocrant and Dr. Reddy found Plaintiff can perform light work, their opinions do not necessarily contradict
     Dr. Chui's findings. However, as outlined in this opinion, because there has not been a functional assessment of

28   Plaintiff's abilities since her surgery, it is unclear whether Plaintiff can even perform light work, especially in light of
     Dr. Mehdi's opinion which suggests Plaintiff may not be able to perform sedentary work.

1

2

Dr. Chiu opined that the claimant could not return to her truck driving work but is not specifically trained to know about other past work or other work in the overall economy that the claimant could perform. Dr. Chui's opinion is not controlling. (SSR 96-5).

3

4

5

6

7

8

Dr. Mehdi opined that the claimant could perform a range of sedentary to less than sedentary work. However, other than noting a decreased range of motion (which can be subjectively manipulated), the claimant had an essentially normal physical examination during the consultative exam. I therefore adopt the DDS physical assessment because it is consistent with the record as a whole, and consistent with the claimant's testimony that she had significant improvement in her neck and hands after the December 2008 surgery. There is no suggestion that the claimant is debilitated to the extent to require in-home support services. The DDS physical opinion is also consistent with the claimant's fairly normal activities of daily living.

9

10

11

12

13

14

15

16

AR 23 (citations omitted). Defendant argues that the ALJ assigned proper weight to the physicians because while Dr. Chiu's opinion contained a diagnosis, none of his reports contained any information related to Plaintiff's specific functional limitations. Moreover, Defendant contends the application of vocational factors is not a medical opinion but one that is reserved for the Commissioner. The Court agrees with some aspects of Defendant's argument: Although Dr. Chiu's assessments are replete with diagnoses, they are limited with regard to an assessment of Plaintiff's functioning in specific areas. AR 495-496; 534-535. A treating physician's opinion is not conclusive as to a physical condition or the ultimate issue of disability. *Magallanes*, 881 F.2d at 751, and *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

17

18

19

20

21

22

23

24

25

26

27

28

However, the ALJ then rejects Dr. Mehdi's report (an examining physician) who opined Plaintiff could lift and carry less than ten pounds, could stand and walk two to four hours out of an eight hour day, and could sit for six hours out of an eight hour day. AR 310-313. In doing so the ALJ stated, "other than noting a decreased range of motion (which can be subjectively manipulated), the claimant had essentially a normal physical exam during the consultative exam." AR 23. The Court agrees with Plaintiff that the ALJ mischaracterized Dr. Mehdi's conclusion. Indeed, Dr. Mehdi found objective symptoms of muscle spasms and decreased sensation that were not normal and then diagnosed Plaintiff with lumbar spine disc disease and lumbar spine radiculopathy. AR 312. This finding is consistent with the other numerous objective tests such as x-rays, MRIs, and CT scans found in the record. AR 381-385; 398-399; 419-428; 432-33; 449; 459-460; 468-471; 534-535. The difficulty with Dr. Mehdi's opinion is

1   that since the time of the evaluation, Plaintiff has had surgery which has impacted her condition.

2   Additionally, it was unclear from the testimony of the VE at the hearing whether a person who

3   possessed the functional limitations imposed by Dr. Mehdi could in fact do sedentary work-- and

4   the ALJ's decision is inconsistent in that regard.  AR 55-56; 22-23.

5       Instead of adopting Dr. Mehdi's opinion or Plaintiff's treating physician's opinion, the

6   ALJ adopted the opinions of the non-examining physicians.  However, the ALJ's reasons for

7   doing so were not legitimate and specific, namely because Dr. Ocrant and Dr. Reddy's

8   evaluations occurred on July 11, 2007 and September 18, 2007.  AR 324-327; 378-379.  Since

9   that time, numerous developments in Plaintiff's treatment have occurred , including surgery in

10  2008 (AR 411-413), steroid injections (AR 344; 349; 353; 364; 394, 434; 436; 454; 458; 478;

11  501; 505; 513; 527; 345; 350; 352; 365; 455; 479; 512; 526; AR 346; 486; 487; 499; 500; 504),

12  acupuncture, and physical therapy (AR 418).  Moreover, one of the reasons Dr. Reddy opined

13  Plaintiff could do light work was because Dr. Chiu indicated Plaintiff could go back to work in

14  October 2007.  AR 378-379.  After her surgery, Dr. Chiu indicated that Plaintiff was unable to

15  return to her work as a truck driver permanently, a substantial change after his initial evaluation.

16      Although the ALJ indicates that Plaintiff's testimony indicated that her hands and neck

17  have improved since the surgery, Plaintiff also clearly testified that she continues to have

18  difficulty with leg and back pain.  AR 57-58; 61. Dr. Chiu's letter dated February 2009, which is

19  the most recent medical diagnosis in the record, indicates that Plaintiff has a severe spinal

20  condition which limits her ability to work.  AR 534-535.   While the Court agrees that the ALJ is

21  not required to accept Dr. Chiu's assessment regarding Plaintiff's inability to return to her prior

22  work as a truck driver, there has not been a functional assessment of Plaintiff's abilities

23  subsequent to her surgery and the numerous forms of treatments she has since undergone.

24      If a treating physician's opinion is not given controlling weight because it is not well

25  supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

26  instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6)

27  in determining what weight to accord the opinion of the treating physician.  Those factors include

28  the "[l]ength of the treatment relationship and the frequency of examination" by the treating

physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. § 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6).

Here, the ALJ rejected both the treating physician and the examining physicians' opinions and accepted evaluations done by the non-examining physicians that were based on outdated medical information.  Moreover, the ALJ did not address any of the factors listed in section 404.1527(d).  Dr. Chiu has treated Plaintiff for several years and is a neurologist.  Other than stating that his opinion is not controlling and summarizing the evaluations, the ALJ did not discuss Dr. Chiu's diagnoses or his opinion.  There is a plethora of medical evidence in the record indicating Plaintiff has a significant medical condition and she has undergone significant pain treatments over several years.  Although Plaintiff's condition appears to have improved since her surgery, Dr. Chiu's opinion indicates that she still has a significant back impairment. Therefore, the Court will remand this case so that updated functional and medical evaluations can be completed to determine what forms of work Plaintiff can indeed perform after her surgery, if any.

### B.      The ALJ's Failure to Consider all of Plaintiff's Impairments

Plaintiff contends that the ALJ did not consider all of her impairments.  Specifically, she argues that the ALJ failed to consider Dr. Michiels's opinion because the ALJ did not consider Plaintiff's GAF score.  Moreover, Plaintiff alleges the ALJ also failed to consider how Plaintiff's diabetes affected her back condition.  These arguments lack merit.

The ALJ considered Dr. Michiel's opinion which diagnosed Plaintiff with a depressive disorder, not otherwise specified, and Dr. Michiel assessed Plaintiff's GAF score at 60.  AR 317. Dr. Michiel opined that Plaintiff could maintain attention and concentration, carry out simple job instructions, handle her own funds, and interact appropriately with coworkers, supervisors, and the general public.  AR 317.  The fact that the ALJ did not specifically address Plaintiff's GAF score is not significant.  A GAF score is a generalized description of the claimant's level of

1  psychological symptoms.  *See, DSM-IV* at 32 (4th Ed.  2000) (DSM IV).  A GAF of 55 or 60 is

2  indicative of moderate limitations in social and/or occupational functioning.  *Id.*

3       The Commissioner has determined the GAF scale "does not have a direct correlation to

4  the severity requirements in [the Social Security Administration's] mental disorders listings." 65

5  Fed.Reg. 50,746, 50,765 (Aug. 21, 2000).  In this case, Dr. Michiel's opinion indicated that

6  Plaintiff's psychological condition was not severe.  He noted that Plaintiff was not taking

7  medications, nor had there been psychiatric hospitalizations, or any mental health treatment.  AR

8  315.  Accordingly, the ALJ did not err in specifically failing to consider the GAF scores because

9  he properly considered the report as a whole which indicated Plaintiff's psychological condition

10  was not affecting her ability to work.

11       Similarly, Plaintiff also argues that although the ALJ identified her diabetes as a severe

12  impairment, he never addressed how this impairment affected her pain, neuropathy, or her ability

13  to work.  This argument is also without merit as Plaintiff has not identified any evidence in

14  support of this contention.  Plaintiff relies on one treatment record indicating her diabetes was

15  out of control because she had not sought medical treatment.  AR 456.  However, this report does

16  not include any report on symptoms or functional limitations as a result of the diabetes.  AR 456.

17  Plaintiff's other citations in support of this argument merely state that Plaintiff has a history of

18  diabetes and that she is allergic to medication to treat her diabetes.  AR 191-192.  Plaintiff is

19  responsible for providing evidence demonstrating that her impairment affects her functioning at

20  the time she is claiming to be disabled.  20 CFR § 404.1512(c).  Unlike the evidence presented

21  regarding Plaintiff's back condition, there was no evidence presented demonstrating Plaintiff's

22  diabetes limited her ability to work in any way.

23       *C.*    *Remaining Issues*

24       Plaintiff argues that the ALJ improperly assessed Plaintiff's credibility.  The Court will

25  not address Plaintiff's argument at the time because the ALJ's failure to appropriately consider

26  the medical evidence may have affected the credibility determination, and new medical evidence

27  will likely impact future credibility findings.   Similarly, Plaintiff's arguments that she be

28  evaluated for a closed period of disability is also affected by an interpretation of the medical

1    evidence.  Accordingly, the Court need not consider these arguments in light of the need for

2    reversal on other grounds.  See, *Watkins v. Barnhart*, 350 F. 3d 1297, 1299 (10th Cir. 2003) ("We

3    will not reach the remaining issues raised by the appellant because they may be affected by the

4    ALJ's treatment of this case on remand); *Byington v. Chater*, 76 F. 3d 246, 250-251 (9th Cir.

5    1996) ("Because we find that the district court committed error and the decision is not supported

6    by substantial evidence, we do not consider the Secretary's other arguments on appeal); *Pendley*

7    *v. Heckler*, 767 F. 2d 1561, 1563 (11thClr. 1985) (per curiam) ("Because the 'misuse of the

8    expert's testimony alone warrants reversal,' we do not consider the appellant's other claims.").

9                                           **REMAND**

10          Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

11   power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

12   or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

13   In Social Security cases, the decision to remand to the Commissioner for further proceedings or

14   simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

15   599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

16   administrative proceedings, a Social Security case should be remanded.  Where, however, a

17   rehearing would simply delay receipt of benefits, reversal and an award of benefits is

18   appropriate."  *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

19   F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

20   useful purpose would be served by further administrative proceedings, or where the record has

21   been thoroughly developed.").  Here, the Court finds that remand for further proceedings  is

22   proper due to the lack of updated medical information and the ALJ's failure to properly address

23   the treating physician's opinion.

24                                    **RECOMMENDATION**

25          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

26   substantial evidence and it is therefore recommended that this case be REVERSED and

27   REMANDED to the ALJ for further proceedings consistent with this opinion.  It is therefore

28

recommended that the Clerk of this Court be directed to enter judgment in favor of Plaintiff Patricia Mendez and against Defendant Michael J. Astrue, Commissioner of Social Security.

These Findings and Recommendations are submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of Title 28 of the United States Code section 636 (b)(1)(B).  Within **twenty (20)** days after being served with a copy, any party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The Court will then review the Magistrate Judge's ruling pursuant to Title 28 of the United States Code section 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:   February 17, 2011**                    **_/s/ Gary S. Austin_**
                                          UNITED STATES MAGISTRATE JUDGE